IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AARON OUTLAW, #353453          *
    Plaintiff,
  v.                                         * CIVIL ACTION NOS. DKC-10-1688
                                                                  DKC-10-1696
MD. DEPT. PUBLIC SAFETY & CORR.    *
  SERVICES, et al
    Defendants.                 *
                                        ***

## **MEMORANDUM OPINION**

I. Procedural History

This consolidated 42 U.S.C. § 1983 prisoner civil rights action seeks damages for the alleged denial of proper medical care. Aaron Outlaw ("Outlaw") claims that from January 28, 2010 to the June 2010 filing date he was denied proper care and medication for his cancer, known as "Polycythemia Vera." Outlaw contends that he was to be transported to the University of Maryland Medical Center ("UMMC") for bloodwork. He states that as a result of the aforementioned inaction he has developed kidney problems and his urine samples show blood, protein, and "spermlike" substances.[1] In supplemental materials, Outlaw seemingly claims that he was denied a pain medication injection for two days the end of July 2010. ECF No. 9.

Defendants Wexford Health Sources, Inc., ("Wexford"), Correctional Medical Services, Inc. ("CMS") and State Defendants Department of Public Safety & Correctional Services ("DPSCS"), Stouffer, Wolfe, and O'Malley have filed Motions to Dismiss or, in the Alternative, for Summary

---

[1] In attachments to his Complaint, Outlaw seemingly claims that he also suffers pain from a hip replacement procedure. ECF No. 1 at Attachments.

Judgment. ECF Nos. 12, 19, & 22. Outlaw has filed opposition materials (ECF Nos. 17 & 24), and Wexford has filed a reply. ECF No. 18. A hearing is not needed to resolve the constitutional issues presented in the matter. *See* Local Rule 105.6. (D. Md. 2010). For reasons which follow, Defendants' Motions shall be granted.

II.     Standard of Review

Motion to Dismiss

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to prove the 'grounds' of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corporation v. Twombley*, 550 U.S. 544, 554, 127 S.Ct. 1955, 1964-65 (2007). "[S]omething beyond the mere possibility of loss causation must be alleged, lest a plaintiff with a 'largely groundless claim' be allowed to 'take up the time of a number of other people...'" *Id*. at 557-558 (quoting *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005). "[T]hreadbare recitals of the elements of a cause of action, supported by mere statements, do not suffice." *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S.Ct. 1937, 1949 (2009). In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept the well-pled allegations of the complaint as true" and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). However, "because the court is testing the legal sufficiency of the claims, the court is not bound by plaintiff's legal conclusions." *Takacs v. Fiore*, 473 F.Supp.2d 647, 651 (D. Md. 2007).

Motion for Summary Judgment

Under the December 10, 2010 revisions to Fed. R. Civ. P. 56(a):

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

In alleging a denial of his Eighth Amendment right to necessary medical care, Outlaw must prove two essential elements. First, he must satisfy the "objective" component by illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. 97, 105 (1976); *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998). If he proves this first element, Outlaw must then prove the second "subjective" component of the Eighth Amendment standard by showing deliberate indifference on the part of Defendants. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Medical personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. Medical staff are not, however, liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id*. at 844; *see also Johnson v. Quinones*, 145 F.3d at 167.

III. Analysis

Wexford and CMS argue that as corporate entities, they cannot be held liable under § 1983. It is well settled law that a claimant may not recover against a municipality on a *respondeat superior* theory under 42 U.S.C. § 1983. *See Monell v. Dep't of Social Services,* 436 U.S. 658, 690-695 (1978). To the extent the Complaint names Wexford and CMS solely upon vicarious liability, circuit law is clear. Principles of municipal liability under § 1983 apply equally to a private

4

corporation. Therefore, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of *respondeat superior*. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982). CMS and Wexford's Motions to Dismiss will be granted.

The court alternatively finds no violation of Outlaw's Eighth Amendment rights based upon his allegations and the papers filed by Defendants. Wexford states that as the Utilization Review Management Provider for the Maryland Department of Public Safety it only receives, reviews, and acts upon requests for referrals to specialists and recommendations for offsite care or hospitalizations. ECF No. 12, Ex. 2. It argues that it does not directly provide any medical care or clinical services to inmates, does not receive care requests directly from inmates, and does not receive any requests to approve medication prescription.

Wexford further claims that on January 14, 2010, it received and approved a request for an offsite evaluation at a pain management clinic for Outlaw's chronic pain evaluations. It further maintains that on February 5, 2010, it received and approved requests for hematology and phlebotomy services for Outlaw, who was seen at UMMC for these services on March 5, 2010. Wexford also states that on February 24, 2010, it received and approved a request for onsite orthopedic evaluation with Dr. Lawrence Manning to address Outlaw's complaints of chronic pain and claim that he took a fall. It asserts that Outlaw was seen by the Center for Rehabilitation and Pain Management at Bon Secours Hospital ("BSH") in Baltimore for chronic pain and an ultrasound and physical therapy were recommended. On March 24, 2010, in follow up to the consults with the orthopedist and specialist in pain management, Wexford received and approved the recommendation for physical therapy. Outlaw subsequently received therapy from Progressive Therapy Network.

*See* ECF No. 12 at Exs. 2 & 3.  Also on March 24, 2010, Wexford approved requests for an offsite urology evaluation and renal ultrasound for Outlaw, secondary to abnormal urinalysis results, hematuria, and proteins in the urine.  On April 16, 2010, Outlaw was seen at BSH for a urology consult and pain evaluation, and underwent a renal ultrasound.  On April 21, 2010, Wexford was notified that the ultrasound had indicated the presence of renal calculi and that as a result a cystoscopy and pyleogram were recommended.  The recommendation was approved by Wexford that same day, along with a request for a CT scan of Outlaw's abdomen.  He underwent a cystoscopy, right pyleogram, and CT scan on June 7, 2010.  On June 10, 2010, Wexford received and approved a post cystoscopy follow-up evaluation by a urology specialist due to Outlaw's hematuria.

On June 30, 2010, Wexford received a request for an additional consult with the pain management clinic.  *Id*., Exs. 2 & 3.  This was disapproved.  Wexford decided to continue with the current conservative management treatment plan because Outlaw was already receiving MS Contin (a controlled release formulation of morphine sulfate) three times a day for pain, as well as Tylenol Codeine #3 and Amitriptyline Hcl.  Wexford affirms that there was a concern that Outlaw might be improperly seeking additional pain medications.  *Id.*.  It maintains that it has not received any requests for care, treatment or referral to specialists regarding Outlaw's care after this date.

For its part CMS argues that Outlaw received constitutionally adequate medical care.  According to their materials, Outlaw has polycythemia vera ("PV"), a disorder of the bone marrow resulting in the production of too many white blood cells, red blood cells, and platelets; chronic pain syndrome for a gunshot wound and fractured femur in 1999; and a history of drug abuse.  ECF No. 19, Ex. A at Moultrie Aff.; Ex. B at pgs. 1-3.   CMS argues that there is no cure for PV and

treatment is designed to manage the symptoms and to reduce the risk of complications. Protocols require that PV patients undergo occasional blood tests to monitor their hematocrit ("Hct") level.[2] When a patient's Hct is above a certain level, he or she may undergo a phlebotomy (blood removal) to reduce the thickness of the blood. ECF No. 19, Ex. A at Moultrie Aff.

Shortly after his arrival in the DPSCS at the Maryland Reception, Diagnostic and Classification Center, Outlaw was seen by Dr. Chhunchha on January 13, 2010, who noted that he remembered Outlaw from a previous incarceration.[3] Outlaw told the physician that he had seen a physician at the UMMC in early January 2010, that his Hct level was around 56%, and no phlebotomy had been performed. Dr. Chhunchha ordered a blood test and noted that if Outlaw's Hct was above 58%, he would arrange for Outlaw to undergo a phlebotomy procedure. Outlaw was told to return to the clinic for a follow-up appointment in two weeks. Outlaw received the blood test on January 14, 2010, and his Hct was 54.8%. *Id.*, Ex. A at Moultrie Aff.; Ex. B at pg. 4.

Outlaw was transferred to the Jessup Correctional Institution on January 26, 2010. Three days later he was evaluated by Dr. Moultrie, who submitted a consultation request for Outlaw to go to UMMC for a hematology consultation for a phlebotomy to bring his Hct down to 45%. ECF No. 19, Ex. A at Moultrie Aff.; Ex. B at pgs. 7-10, & 12. On February 17, 2010, Outlaw's Hct was 57.4%. On February 19, 2010, Moultrie prescribed Aspridox, a form of aspirin, to thin the blood to prevent clots. *Id.*, Ex. A at Moultrie Aff.; Ex. B. at pgs. 15, 17, 79, & 81. On March 5, 2010,

---

[2] Hct is a blood test that measures the percentage of the volume of whole blood that is made up of red blood cells. This measurement depends on the number and the size of red bloods cells.

[3] Court records show that Outlaw filed a civil rights complaint regarding his PV care in 2009 and was paroled during the pendency of that case. *See Outlaw v. CMS,* Civil Action No. DKC-09-1704 (D.Md.)

Outlaw underwent a phlebotomy at UMMC. ECF No. 19, Ex. A; Ex. B at pg. 24. On May 12, 2010, Outlaw's Hct was 53.9% and on June 3, 2010, his Hct was 53%. Outlaw's Hct will continue to be monitored and he will undergo phlebotomies as needed. *Id*., Ex. A at Moultrie Aff.; Ex. B at pgs. 43 & 52.

Outlaw complains of chronic pain. On January 13, 2010, he received Tylenol #3 with codeine. Ultram was also prescribed, but the medication was discontinued after he developed a rash. *Id*., Ex. A; Ex. B at pgs. 3, 8, 74-77. On January 27, 2010, a bottom bunk physician's order was submitted for Outlaw because of his medical conditions. That same date Moultrie prescribed a two-week regimen of Tylenol #3 with codeine for pain and Nubain injections (a narcotic analgesic) for "breakthrough" pain for 24 hours. Moultrie again saw Outlaw on January 29, 2010, and renewed the Nubain for another three days and also prescribed Salsalate, a non-steroidal anti-inflammatory drug ("NSAID"), for Outlaw to keep in his cell and take routinely. *Id*., Ex. At Moultrie Decl.; Ex. B at pgs. 6-11, 13, & 77-78. A pain management consultation request was also submitted. On February 1, 2010, Outlaw received a dose of Nubain for pain. On February 16, 2010, Moultrie prescribed Elavil, an anti-depressant that is also used to treat nerve pain. Outlaw continued to complain of pain and was treated with additional medications, such as Motrin. On February 19, 2010, he complained of a locking sensation in his mouth, which he attributed to the Salsalate. The Salsalate was discontinued and Moultrie prescribed Naprosyn, another type of NSAID, for one month. *Id*., Ex. A at Moultrie Aff.; Ex. B at pgs. 11, 13, 16-17, 79 & 82.

On March 2, 2010, an orthopedic surgeon, Dr. Lawrence A. Manning, evaluated Outlaw. Manning noted that the fracture of Outlaw's femur in 1999 had been repaired with rods. He recommended that Outlaw received a cane for ambulatory assistance and prescribed Tylenol #3 with

8

Codeine as need for ten days. Outlaw was also placed on "feed-in" for three months. ECF No. 19, Ex. A at Moultrie Aff.; Ex. B at pgs. 18-23 & 83-87. On March 18, 2010, Outlaw was evaluated by Dr. Cornell Shelton, a pain management specialist at BSH. Shelton noted that Outlaw had a history of using heroin and oxycontin. His examination of Outlaw revealed that he had a flaccid left arm, but good strength in his right arm and legs. Shelton's assessment was that Outlaw had muscle spasms, hip pain, left shoulder dislocation, and neuropathic pain. He recommended that Outlaw receive several medications including MS Contin for pain and Lyrica, a drug used to treat nerve pain. Moultrie prescribed the MS Contin on March 26, 2010; he did not prescribe the Lyrica because Outlaw was already taking Elavil. *Id*., Ex. A; Ex. B at pgs. 25-27, & 88-90.

On June 7, 2010, Outlaw's cane and feed-in recommendations were renewed for three months. On June 20, 2010, medical staff issued verbal and telephone orders for Outlaw to receive MS Contin and Tylenol #3 with Codeine. On June 23, 2010, Nurse Practitioner Lum Maximuangu submitted a consultation request for a follow-up pain management evaluation because Outlaw claimed that his pain management regiment was not controlling his pain. On July 13, 2010, a medication order was entered for Nubain and MS Contin. In addition, on August 5, 2010, Dr. Dolph Druckman evaluated Outlaw for his "drug-seeking" behavior. He noted that Outlaw had no difficulty getting onto the examination table, but did appear to have pain at his hips and right pelvis. He prescribed Naprosyn and continued Outlaw's MS Contin. He also informed Outlaw that no additional pain medications would be provided, particularly on an "emergent" basis, such as when Outlaw visits the dispensary asking for additional doses of Nubain for breakthrough pain. On August 13, 2010, Outlaw was given an egg crate mattress for comfort and a recommendation for a bottom bunk on a lower tier. *Id*., Ex. A; Ex. B at pgs. 56, 57-59, 60-61, 64, 66-70, 91, & 93.

On August 17, 2010, Outlaw was brought to the dispensary complaining that he could not breathe and felt sleepy. His pupils were decreased and he appeared lethargic and drowsy. He had received a dose of Nubain and had taken Tylenol #3 with Codeine. Outlaw was started on oxygen and Dr. Tadesse Tedla was notified. Per Tedla's order Narcan, a narcotic antagonist, was given to Outlaw. In 15 minutes he was alert and awake and was able to walk back to his housing unit with a steady gait. ECF No. 19, Ex. A at Moultrie Aff.; Ex. B at pgs. 71-73 & 92.

CMS also notes that on January 27, 2010, Outlaw complained of hematuria (blood in the urine). Dr. Moultrie evaluated Outlaw on February 9, 2010, and noted tenderness in his back in the region of his kidneys. A test of Outlaw's urine was positive for blood. Dr. Moultrie ordered a routine urinalysis and urine culture. Because he thought Outlaw may have a urinary tract infection, Moultrie prescribed the antibiotic Bactrim. The hematuria did not clear up with the antibiotic. On March 19, 2010, Moultrie submitted a consultation request to have Outlaw seen by a urologist. *Id.*, Ex. A; Ex. B at pgs. 5, 14 & 28. On April 12, 2010, Outlaw underwent an ultrasound of his kidneys. The test showed a possible kidney stone in the right side. On April 16, 2010, he was seen by urologist Dr. Kofi Shaw-Taylor at BSH. The physician assessed Outlaw as having a kidney stone and recommended a CT scan of his abdomen, a cysoscopy, and a retrograde pyelogram. Outlaw was seen by healthcare personnel for pre-operative evaluation on May 12, 2010, and underwent these tests on June 7, 2010. They were all normal. Shaw-Taylor recommended that Outlaw receive the antibiotic Cipro and Pyridium, a medication that relieves urinary tract pain, burning and irritation, and urinary frequency. *Id.*, Ex. A; Ex. B at pgs. 29, 31-41, 44-51, 53-55, 57, 62, & 65.

On September 17, 2010, Outlaw received a follow-up appointment with Shaw-Taylor. Although Outlaw did not complain of any pain, Shaw-Taylor recommended that Outlaw receive an x-ray of his abdomen and the he undergo lithotripsy[4] to treat his kidney stones. CMS claims that it will seek approval from Wexford to follow Shaw-Taylor's recommendations. *Id*., Ex. A at Moultrie Aff.; Ex. B at 103.

The court has examined Outlaw's Oppositions. He has been called upon to rebut Defendants' exhibits to show a triable issue of fact regarding treatment for his PV, pain, and hematuria. He has failed to so do. The materials demonstrate that: (1) all but one referral and consultation to specialists were approved by Wexford within reasonable periods of time; (2) he was and will be monitored for his PV condition with routine hematocrit testing and will undergo phlebotomy procedures when required; (3) he received pain medications (Nubain, Ultram, Motrin Naprosyn, Salsalate, Tylenol #3 with Codeine, and MS Contin) as needed for his complaints of chronic pain, only tempered by medical staff concern for his drug abuse history; and (4) he has received evaluations, testing, and procedures to identify and treat his hematuria. Outlaw has failed to prove that the actions (or inactions) of Defendants evince deliberate indifference.[5] To the contrary, the records demonstrate timely and comprehensive treatment of his complaints.

---

[4] Lithotripsy is a medical procedure that uses shock waves to break up kidney stones.

[5] To the extent that Outlaw claims medical negligence with regard to Defendants' care, his allegations are not reviewable by the court. Allegations of negligence are insufficient to state a claim under the Eighth Amendment because negligence is not actionable under 42 U.S.C. § 1983. *See Davidson v. Cannon,* 474 U.S.344, 347-48 (1986); *Daniels v. Williams,* 474 U.S. 327, 333-34, (1986); *Estelle,* 429 U.S. at 106. Moreover, Outlaw is required to comply with the requirements of Maryland's Health Care Malpractice Claims Act ("HCMCA") prior to bringing a medical malpractice claim. He must exhaust his medical malpractice claim before the Maryland Health Claims Alternative Dispute Resolution Office as a condition precedent to any judicial action. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-02. This exhaustion requirement applies to claims of medical malpractice filed in federal courts. *See Davison v. Sinai Hospital of*

IV. Conclusion

For the aforementioned reasons, Defendants' Motions to Dismiss or for Summary Judgment will be granted.[6] Judgment is entered in favor of Defendants and against Outlaw. A separate Order follows.

Date:   February 2, 2010                             /s/
                                          DEBORAH K. CHASANOW
                                          United States District Judge

---

*Baltimore, Inc.,* 462 F. Supp. 778, 779-81 (D. Md. 1978*); see also Lewis v. Waletzky*, 576 F. Supp. 732, 736-387 (D. Md. 1978). Outlaw's medical malpractice claim shall be dismissed without prejudice. *See, e.g. Octopi v. McGowan*, 294 Md. 83, 447 A.2d 860, 864-65 (Md. 1982) (holding that the condition precedent of exhaustion does not take away the subject matter jurisdiction of a state circuit court to hear and render judgments in cases involving claims that fall within the Health Care Malpractice Claims Act).

[6]   Outlaw has also named the DPSCS, the Division of Correction Commissioner, the JCI Warden and the Governor of Maryland as Defendants. Outlaw raises no particular claims against these Defendants Further, as noted by counsel, medical care at the prison is performed by a medical contractor, Defendant CMS. ECF No. 22. The State Defendants are entitled to rely on the judgment of medical personnel to manage inmate medical treatment. *See Miltier v. Beorn*, 896 F.2d 848, 854-55 (4th Cir. 1990). Moreover, in reliance on the Medical Defendants' records, counsel for the State Defendants argue that Outlaw's Eighth Amendment claims have no merit. ECF No. 22. The court agrees.